The STATE of Ohio, Appellee,

v.

HUMPHRIES, Appellant.

[Cite as *State v. Humphries* (1992), 79 Ohio App.3d 589.]

Court of Appeals of Ohio,
Clermont County.

No. CA91–10–081.

Decided May 18, 1992.

*Donald W. White,* Clermont County Prosecuting Attorney, and *David H. Hoffmann,* Assistant Prosecuting Attorney, for appellee.

*R. Daniel Hannon,* Clermont County Public Defender, and *Gary A. Rosenhoffer,* Assistant Public Defender, for appellant.

*Per Curiam.*

Defendant-appellant, Jessie J. Humphries, a.k.a. Jimmy Humphries, appeals a conviction in the Clermont County Court of Common Pleas for gross sexual imposition.

Appellant was indicted by the Clermont County Grand Jury for gross sexual imposition pursuant to R.C. 2907.05(A)(4) on June 5, 1991. The case was tried to a jury on August 22, 1991.

The state presented evidence that on April 26, 1991, Kathy Mueller dressed her six-year-old daughter, the victim in the case, for a wedding in which the little girl was to participate later that day. Mueller worked from 11:00 a.m. to 7:00 p.m. and was unable to attend the wedding. However, Mueller's neighbor, Sandra Campbell, agreed to take the child to the wedding. Campbell lived a short distance away from Mueller with her boyfriend, Rick Purdon, and her eight-year-old daughter, Crystal. Campbell often baby-sat the victim, who was Crystal's playmate, and had known the victim for approximately one year.

The victim was dressed in ankle socks, regular underwear, and a dress which extended to her knees when she arrived at Campbell's residence. At about 4:30 p.m., Campbell, Purdon, Crystal and the victim left in Campbell's automobile. Campbell drove to the residence of appellant, who was a friend of Purdon's. Mueller knew appellant only as an acquaintance and was unaware that he was going to the wedding. The victim had seen appellant on a few occasions and knew him as an acquaintance.

The group arrived at the wedding and the girls participated in the ceremony. At the reception which followed, appellant and Purdon consumed alcohol. Although Campbell consumed approximately eight beers, she felt that both Purdon and appellant were intoxicated, and she was better able to drive.

In the early morning hours of April 27, Campbell drove appellant and the others home from the wedding. Purdon rode in the front passenger seat of

the automobile, while Crystal, appellant and the victim rode in the back. Crystal sat behind Purdon and leaned against the door of the automobile. The victim sat between Crystal and appellant. Although the victim was awake when she left the wedding, both she and Crystal fell asleep on the way home. En route, the victim lay on appellant's legs, and appellant used Campbell's dress, which had been lying on the back seat, as a blanket for the victim.

Subsequently, the car began to overheat and Campbell stopped at a convenience store to purchase antifreeze. She and Purdon went into the store while the victim, Crystal and appellant remained in the automobile. The victim testified that at that time, appellant grabbed her between the legs and in the general area under her dress. When Campbell returned and entered the automobile, she noticed that the victim, who had been sleeping, was awake. The victim asked Campbell if she could sit in the front seat of the automobile. Campbell testified that the victim seemed upset and afraid. However, at the time, she did not recognize the significance of the victim's emotions and denied her request.

Campbell drove appellant to his residence in Amelia. The girls again fell asleep in the back seat of the automobile. When they arrived at Campbell's residence, Purdon carried the victim into the house where she and Crystal slept on the couch.

The next morning, at approximately 9:00 a.m., Campbell left the children in the care of her eldest daughter while she prepared to drive Purdon to work. Campbell and Purdon left the residence and entered the car. At that time, Crystal ran out of the house and told them that the victim had told her something. After this, the victim came out looking upset and walked directly to the automobile. She told Campbell that "Hump had touched her down below." The victim then placed her hand between her legs to demonstrate. Campbell told the victim to go home and tell her mother, who was arriving home from work.

As Mueller returned home from work, she noticed the victim standing at the end of the driveway with Crystal approaching from a distance. Mueller also noticed that the victim had a "awkward" look on her face. The victim approached Mueller's automobile as soon as it stopped. When Mueller exited her automobile, the victim told her that "Hump had grabbed her down below" and again demonstrated what had happened.

Mueller became hysterical and took the victim back to Campbell's house for more information. Eventually, Mueller contacted the Clermont County Sheriff's Office, where a detective interviewed the victim. A social worker from the Clermont County Department of Human Services advised Mueller to contact the Social and Medical Clinic at Children's Hospital in Cincinnati to

arrange for a medical examination for the victim. Unfortunately, Mueller's call to the clinic resulted in an appointment approximately three weeks later. When the victim was taken to the clinic and examined by a doctor, a report was prepared by a social worker and the doctor.

Appellant was interviewed by an investigator with the Clermont County Sheriff's Office during the afternoon hours of April 27, 1991. At that time, appellant told the investigator that he did not remember the events of the previous evening due to his intoxication.

At trial, appellant testified on his own behalf. He stated that the child fell asleep in the back seat of the car and was lying on Crystal's leg, not his. He further testified that he covered the victim with Campbell's dress, but that he did not grab her between the legs.

Appellant attempted to introduce into evidence a copy of the social and medical clinic's report or "SAM report," which was prepared as a result of the victim's medical examination. The report indicated that the victim exhibited itching, but otherwise did not suffer any apparent signs of sexual abuse. However, the report also concluded that the examination was consistent with the history given. The state provided appellant with a copy of the report prior to trial. The state had originally planned to call as a witness the doctor who prepared the report and had issued a subpoena, but later decided not to call the doctor as a witness. As a result, the doctor was not present at trial. When appellant attempted to introduce the report into evidence, the trial court refused, concluding that it contained hearsay and that it was not adequately authenticated.

At the conclusion of the evidence, the jury found appellant guilty as charged. The trial court sentenced him to serve eighteen months' imprisonment and to pay the cost of any counseling for the victim. This appeal followed.

■ Appellant presents four assignments of error for review. In his first assignment of error, appellant states that the trial court erred in refusing to admit the SAM report into evidence. He argues that the report was admissible as an exception to the physician-patient privilege pursuant to R.C. 2151.-421. Appellant also argues that because the report was served upon him by the state through discovery, it should have been admitted without further authentication. We find this assignment of error is not well taken.

R.C. 2151.421 requires certain persons to report suspected child abuse to the proper authorities and grants them immunity from prosecution for doing so in good faith. Appellant relies on R.C. 2151.421(G)(1), which states:

" * * * Notwithstanding section 4731.22 of the Revised Code, the physician-patient privilege shall not be a ground for excluding evidence regarding a child's injuries, abuse, or neglect, or the cause of the injuries, abuse, or neglect in any judicial proceeding resulting from a report submitted pursuant to this section."

However, appellant's reliance on this section is misplaced. Subsection (H)(1) of the same statute states: "In a criminal proceeding, the report is admissible into evidence in accordance with the Rules of Evidence and is subject to discovery in accordance with the Rules of Criminal Procedure." The trial court did not exclude the report on the basis of physician-patient privilege. The court concluded that the report was not adequately authenticated and contained hearsay, and was therefore inadmissible under the Rules of Evidence. We agree with the trial court's conclusion.

■ Generally, authenticated medical records are admissible at trial. *Hunt v. Mayfield* (1989), 65 Ohio App.3d 349, 352, 583 N.E.2d 1349, 1350. Although potentially replete with hearsay problems, medical records are admissible under the exception to the hearsay rule for records of regularly conducted activity set forth in Evid.R. 803(6) and its statutory counterpart, R.C. 2317.40. Evid.R. 803(6) provides:

"A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Under this rule, appellant was required to authenticate the medical record through the testimony of the custodian or the person who prepared or supervised the preparation of the record. Alternatively, the language "or as provided by Rule 901(B)(10)" permits the admission of hospital records under R.C. 2317.422. 1 Weissenburger, Ohio Evidence, Section 803.73. R.C. 2317.-422 provides a simplified means of authenticating hospital records which eliminates the necessity for the in-court testimony of the custodian. *State v. Spikes* (1981), 67 Ohio St.2d 405, 408–411, 21 O.O.3d 254, 256–258, 423 N.E.2d 1122, 1126–1128, appeal dismissed (1982), 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284; *Hunt, supra,* 65 Ohio App.3d at 353, 583 N.E.2d at 1351; *State*

*v. Marshall* (May 18, 1990), Lake App. No. 89–L–14–022, unreported, at 2–3, 1990 WL 67766. R.C. 2317.422 provides as follows:

"Notwithstanding sections 2317.40 and 2317.41 of the Revised Code, the records, or copies, or photographs thereof, of a hospital * * * in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made, may be qualified as authentic evidence if any such person endorses thereon his verified certification identifying such records, giving the mode and the time of their preparation, and stating that they were prepared and used in the usual course of business of the institution. * * * Nothing in this section shall be construed to limit the right of any party to call the custodian, person who made such records, or person under whose supervision they were made, as a witness."

■ It is undisputed that the medical report in the present case did not have the certification required by R.C. 2317.422. Appellant presented the testimony of a sheriff's investigator that he kept a copy of the report in the ordinary course of business. However, Evid.R. 803(6) requires testimony as to the preparation of the report and not merely the place where it was kept. Accordingly, appellant did not lay a proper foundation for the admission of the report under Evid.R. 803(6), and the trial court did not err in concluding it was not admissible on that basis.

■ Appellant claims that because the state provided him with the report through discovery, and at one point planned to introduce it into evidence and to call as a witness the doctor who produced it, the report was adequately authenticated. We cannot agree. The report probably would have been admissible had appellant sought the testimony of the doctor who prepared the report or obtained the necessary certification. However, he did not. We find no authority for appellant's contention that he could rely on the state's subpoena instead of issuing his own if he wished to rely on the doctor's testimony in his case-in-chief. We conclude that appellant's inability to use the SAM report as evidence was self-imposed and therefore its exclusion from evidence did not deny him his right to due process. See *State v. Heinish* (1990), 50 Ohio St.3d 231, 240, 553 N.E.2d 1026, 1036, fn. 5.

■ Appellant also claims that the SAM report was admissible as an exception to the hearsay rule under Evid.R. 803(4) and (8). Evid.R. 803(4) provides that statements made for purposes of medical diagnosis or treatment are exceptions to the general prohibition against hearsay. However, appellant sought to have statements made by the physician in the report admitted into evidence. Evid.R. 803(4) is "limited to those statements made by the patient." Staff Note to Evid.R. 804. It does not permit the introduction of out-of-court

statements by physicians as to the treatment prescribed or the diagnosis reached. Weissenburger, *supra*, at Section 803.45.

Evid.R. 803(8) sets forth the hearsay exception for public records and reports. It provides:

"Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness."

■ We cannot agree with the trial court's conclusion that the SAM report ·is not a "public" record because its contents are not generally available to those who wish to see it. The rule's use of the descriptive term "public" when referring to the records embraced by the exception is actually a misnomer. A more accurate description is the term "official," meaning "made or done by an officer of the government." The rule refers to records of government agencies or officers, not necessarily to records that are open to all or capable of being known or observed by all. Weissenburger, *supra*, at Section 803.102.

■ Nevertheless, we conclude that the report was not admissible under Evid.R. 803(8) because, unlike the Federal Rules of Evidence, the public records exception under the Ohio rules does not encompass evaluative or investigative reports. *Cincinnati Ins. Co. v. Volkswagen of Am., Inc.* (1987), 41 Ohio App.3d 239, 241–242, 535 N.E.2d 702, 704–706; *Haberman v. Indus. Excess Landfill, Inc.* (Aug. 10, 1987), Stark App. No. CA–7130, unreported, at 2–3, 1987 WL 15601. Accordingly, even though the SAM report was produced through the efforts of the department of human services, it is an investigative report and is therefore not admissible under the public records exception to the hearsay doctrine.

In sum, we conclude that the report was hearsay which did not fall under any exception to the hearsay rule. Therefore, the trial court's decision to exclude it from evidence was not so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. See *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 19 OBR 330, 336, 483 N.E.2d 1157, 1164, certiorari denied (1986), 474 U.S. 1073, 106 S.Ct. 837, 88 L.Ed.2d 808; *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172, 404 N.E.2d 144, 148. Further, we cannot conclude appellant was prejudiced by its exclusion because there was no reasonable probability that the exclusion affected the outcome of the proceedings. See *State v. Bayless* (1976), 48 Ohio St.2d 73, 2 O.O.3d 249, 357

N.E.2d 1035, paragraph seven of the syllabus, vacated as to death penalty (1978), 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155. Accordingly, appellant's first assignment of error is overruled.

In his second assignment of error, appellant states that the trial court erred in admitting hearsay statements of the victim into evidence. Appellant argues that the victim's statements were too remote in time from the startling event to qualify under the excited utterance exception to the hearsay rule. We find this assignment of error is not well taken.

Evid.R. 803(2) defines an "excited utterance" as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In determining whether a statement qualifies as an excited utterance, the court should consider (1) the lapse of time between the event and the statement, (2) the mental and physical condition of the declarant, (3) the nature of the statement, and (4) the influence of intervening circumstances. Staff Note to Evid.R. 803(2); *Miles v. Gen. Tire & Rubber Co.* (1983), 10 Ohio App.3d 186, 190, 10 OBR 258, 261, 460 N.E.2d 1377, 1381. The trial court is afforded wide discretion in determining whether a declarant was under the stress of excitement caused by a startling event at the time the statement was made. *State v. Wallace* (1988), 37 Ohio St.3d 87, 90, 524 N.E.2d 466, 469; *State v. Fowler* (1985), 27 Ohio App.3d 149, 152, 27 OBR 182, 184, 500 N.E.2d 390, 393.

Time is not necessarily the controlling factor in determining whether a statement qualifies as an excited utterance. The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection. *State v. Smith* (1986), 34 Ohio App.3d 180, 190, 517 N.E.2d 933, 944. "Spontaneity and the lack of an opportunity to engage in reflective thought are the essential criteria in determining whether this exception to the hearsay rule is applicable in a given cause." *State v. Moorman* (1982), 7 Ohio App.3d 251, 252, 7 OBR 330, 332, 455 N.E.2d 495, 497.

Accordingly, in *Wallace, supra,* the Ohio Supreme Court concluded that a period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purpose of satisfying the excited utterance exception to the hearsay rule. Thus, the statements of a child victim of assault after regaining consciousness were admissible into evidence because there was no showing that the child had a meaningful opportunity to reflect. *Id.,* 37 Ohio St.3d at 91, 524 N.E.2d at 470. Likewise, in *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, the child was allegedly raped by her father during visitation. The mother picked up the child, who fell asleep in the car on the way home. The child

subsequently awoke screaming and stated that her father had raped her. The Supreme Court held that this statement was admissible as an excited utterance because the two-and-one-half-year-old child was still in a state of excitement at the time she made the statement. *Id.* at 117–118, 545 N.E.2d at 1230–1231.

In the present case, the offense took place at approximately 2:00 a.m. The record demonstrates that the child was tired and fell asleep. Immediately after waking, the victim told the other child, Crystal, then went outside and told Crystal's mother, Campbell, about the incident. Campbell testified that the child walked directly to her car before she made the statement and behaved as if she was acting out an obligation to tell what happened. Further, Campbell testified that the victim looked very upset and worried. Campbell immediately told the child to tell her mother. The child was waiting for her mother when she drove into the driveway. The victim appeared fidgety and anxious and walked directly to her mother and told her what had happened.

Appellant argues that the victim's statement to her mother was made in response to Mueller's questioning. However, Mueller only asked the victim to repeat what she had already said. Her questioning was not coercive; it facilitated the victim's expression of what she was thinking and did not destroy the nervous excitement under which the statement was made. *Wallace, supra,* at paragraph two of the syllabus. Under the circumstances, we cannot conclude that the trial court's decision to admit the statement as an excited utterance was so unreasonable, arbitrary or unconscionable as to connote an abuse of discretion. See *Martin, supra; Adams, supra.* Accordingly, appellant's second assignment of error is overruled.

In his third assignment of error, appellant states that the jury verdict was against the manifest weight of the evidence. Appellant argues that the victim's testimony was inconsistent and did not support the conviction. We find this assignment of error is not well taken.

A reviewing court will not reverse a jury verdict when there is substantial evidence upon which a jury could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. We find, after reviewing the evidence, particularly the victim's testimony, that there was substantial evidence from which a jury could reasonably conclude that appellant engaged in sexual contact with the victim, who was less than thirteen years of age, thereby supporting the conviction for gross sexual imposition.

 Essentially, appellant is arguing that the victim's testimony is not credible. However, credibility is a question of fact to be determined by a jury and, as a reviewing court, we will not substitute our judgment for that of the jury. *State v. Walker* (1978), 55 Ohio St.2d 208, 212, 9 O.O.3d 152, 154, 378 N.E.2d 1049, 1051, certiorari denied (1979), 441 U.S. 924, 99 S.Ct. 2033, 60 L.Ed.2d 397. Accordingly, appellant's third assignment of error is overruled.

In his fourth assignment of error, appellant states that the guilty verdict is contrary to law. Appellant relies on the arguments made in his three previous assignments of error. However, since we have already concluded that the arguments presented in his three other assignments of error lack merit, we also conclude that appellant's fourth assignment of error lacks merit, and it is hereby overruled.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

KOEHLER, P.J., WALSH and REID, JJ., concur.

M. DAVID REID, J., of the Greene County Court of Common Pleas, sitting by assignment.