[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
OPINION
Dr. Michael Pyles and Susan Pyles ("Appellants") appeal the judgment of the Court of Common Pleas of Allen County in favor of Midwest Neurosurgery and Spine Associates, Inc. and Dr. Ronald Michael ("Appellees") in a medical malpractice action.
Dr. Pyles was a physician with a practice in family medicine from late 1989 until February 14, 1996. In February 1992, Dr. Pyles suffered a back injury. That same year Dr. Pyles had back surgery performed by Dr. O. Richard Singer. In July 1994, Dr. Pyles had substantial back problems requiring surgery by Dr. David A. Cooley. That surgery resulted in complications which required a third surgery by Dr. Singer in August 1994. After his injury, Dr. Pyles was treated by Drs. Mark A. MacNealy, Thomas F. Goodall, Thomas M. Santanello, Singer, Cooley, and M. A. Wrangler.
Thereafter, in October 1994, Dr. Pyles met Dr. Michael. They had an office sharing arrangement. On March 15, 1995, Dr. Michael performed a fourth surgery on Dr. Pyles. After the surgery, Dr. Pyles filed a complaint alleging that Dr. Michael improperly performed the surgery and that the surgery was done without informed consent. Specifically, Dr. Pyles alleged that Dr. Michael began the surgery on his back in a different location than had been agreed to by Dr. Pyles.[1] A jury trial resulted in a verdict for Dr. Michael and the Midwest Neurosurgery and Spine Associates, Inc.
The Appellants now appeal setting forth two assignments of error.
 ASSIGNMENT OF ERROR NO. I It is prejudicial error to admit into evidence, over objection, medical treatises as substantial evidence of the theories and opinions therein expressed, and this is particularly true where the evidence in the case is conflicting and of such character that a verdict for either side would be supportable.
The Appellants contend that the trial court committed reversible error by permitting Dr. Michael to quote from a learned treatise on direct examination.
Trial courts have broad discretion in the admission or exclusion of evidence. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Accordingly, we will not reverse a trial court's ruling absent an abuse of discretion. Freshwater v.Scheidt (June 3, 1997), Paulding App. No. 11-96-10, unreported.
An abuse of discretion has been defined as more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Adams
(1980), 62 Ohio St.2d 151, 157 (citations omitted). We will not substitute our judgment for that of the trial court, but we will defer to a judgment that is reasonable under the circumstances of the case. Beck v. Matthews (1990), 53 Ohio St.3d 161, 169
(citations omitted).
 The learned treatise exception to the hearsay rule set forth in Fed. Evid. R. 803(18) has no counterpart in Ohio Evid. R. 803. In Ohio, a learned treatise may be used for impeachment purposes to demonstrate that an expert witness is either unaware of the text or unfamiliar with its contents. Moreover, the substance of the treatise may be employed only to impeach the credibility of an expert witness who has relied upon the treatise * * * (citation omitted) or has acknowledged its authoritative nature.
 Stinson v. England (1994), 69 Ohio St.3d 451, paragraph two of the syllabus. See, also, Ramage v. Central Ohio Emergency Serv., Inc.
(1992), 64 Ohio St.3d 97, 110. The basis for the exclusion of the learned treatise as hearsay is set forth in Piotrowski v. CoreyHosp. (1961), 172 Ohio St. 61, 69:
 Such rule corresponds with the decided weight of authority which is to the effect that medical and other scientific treatises representing inductive reasoning are inadmissible as independent evidence of the theories and opinions therein expressed. The bases for exclusion are lack of certainty as to the validity of the opinions and conclusions set forth, the technical character of the language employed which is not understandable to the average person, the absence of an oath to substantiate the assertions made, the lack of opportunity to cross-examine the author, and the hearsay aspect of such matter.
"It should be noted that the erroneous admission in[to] evidence of `learned treatises' will not justify reversal of an otherwise valid adjudication where the error does not affect substantial rights of the complaining party, or the court's action is not inconsistent with substantial justice." O'Brien v. Angley
(1980), 63 Ohio St.2d 159, 164 (citations omitted). As stated by the Court in O'Brien, we "must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of facts would probably have made the same decision" to determine if substantial justice has been accomplished. O'Brien, supra quoting Hallworth v.Republic Steel Corp. (1950), 153 Ohio St. 349, paragraph three of the syllabus.
"Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinions regarding the facts." Ramage, 64 Ohio St.3d at 102, citing McKayMachine Co. v. Rodman (1967), 11 Ohio St.2d 77. In the case at bar, Dr. Pyles testified in an expert capacity regarding the procedure performed on him in his case-in-chief. Dr. Pyles testified that he was involved in neurological surgeries in his medical internship, in his residency, and in his own practice. Specifically, he stated that he had been involved in many diskectomies. Furthermore, Dr. Pyles stated on direct examination that he kept abreast of the field by reading the latest books, including Reoperative Neurosurgery. On the cross-examination of Dr. Pyles, he cited Reoperative Neurosurgery
as an authoritative text and stated that according to the book there was only one proper procedure to be followed for his surgery by Dr. Michael. Dr. Pyles testified as follows:
 Q. Doctor, your contention, as I understand it in this case, is that Doctor Michael did a surgery that you didn't know he was going to do and if you had known he was going to do it, the extent of the surgery, you would have never agreed to it; is that correct?
 A. Absolutely. I approved a surgery for L2/3 and he starts at T11. That was never discussed.
 Q. Wait, wait, wait. He told you he was going to do a repeat L2/L3 laminectomy; didn't he?
 A. No. He said a repeat L2/3 disketomy. There is no laminectomy because there is no lamina left. It's already been gone.
* * *
 Q. Do you concede, Doctor, that different physicians may approach a problem differently and that each of them is operating within the standard of care?
A. No, not exactly.
 Q. There's more than one appropriate way to treat different conditions; isn't there?
A. Not according to Reoperative Neurosurgery.
* * *
 Q. You've read someplace there that that's not the way you do it?
A. Absolutely.
Q. Can you give me the citation to it?
 A. Well, they talk about early and late reoperations for a herniated disk and a repeat herniated disk. This book is strictly about repeating; doing repeated herniated disks.
 Q. Do you consider that book, whatever it was that you read, to be authoritative?
A. Absolutely.
In the defense's case-in-chief, Dr. Michael cited a specific passage of Reoperative Neurosurgery in defense of the procedure performed on Dr. Pyles:
 Q. Okay. Doctor, here is what I believe is the text referred to by Doctor Pyles as the authoritative text, called Reoperative Neurosurgery, by John R. Little and Esauma A. Awap; okay? Do you consider that to be authoritative?
A. For reoperative procedures, yes.
* * *
 Q. Does this text contain any information or any description of how to do a repeat L2/L3 diskectomy, or repeat disketomies?
A. Yes.
Q. Okay. What portion of that text deals with that?
 A. There's a chapter out of seventeen which deals with lumbar spine repeat surgery.
 Q. Okay. Is there a portion of that text which is specific as to the technique to be used?
 A. Yes. It's under the section which talks about re-exploring a previous laminectomy, which is what we did. May I read?
* * *
Q. Go ahead.
 A. "Re-exploration of a complete laminectomy can be a rather formidable procedure. In this circumstance the scar tissue is intimately associated with a considerable area of the dura compared to that encountered after prior lumbar laminotomy substantially increasing the possibility of a dural tear. The first step in the re-exploration of a complete laminectomy is a bilateral subperiosteal dissection of the intact vertebra immediately above and below the levels of prior laminectomies."
 Q. Doctor, what was — I guess I have to get the terminology exactly straight here — in the surgery that you did on Doctor Pyles it was at what level?
A. L2/3.
 Q. And what was the intact vertebrae immediately above L2/L3?
A. T11.
Q. And where did you begin your surgery?
A. T11.
Dr. Michael was later cross-examined by the Appellants concerning the book.
Here, Dr. Pyles was a medical doctor who testified on his own behalf as to what proper medical procedures should have been used in his surgery. As demonstrated, Dr. Pyles testified that he found Reoperative Neurosurgery to be authoritative. Accordingly, the learned treatise may be used to impeach him. According toStinson, the Appellees could have further cross-examined Dr. Pyles concerning the above quoted passage. The Appellees did not do this; instead, Dr. Michael read the passage on his direct examination. See Ramage, 64 Ohio St.3d 97 (holding that a statement from a learned treatise was properly used on direct examination to impeach anticipated testimony from an adverse expert witness). We find that the learned treatise was used to impeach Dr. Pyles's testimony. Thus, we find that the passage quoted by Dr. Michael from Reoperative Neurosurgery was properly admitted as impeachment evidence. Additionally, we note that Dr. Pyles used the learned treatise extensively on the cross-examination of Dr. Michael. Accordingly, the trial court did not abuse its discretion in allowing Dr. Michael to recite the above passage into evidence, as it was a proper impeachment technique.[2]
Moreover, in this case, Dr. Pyles opened the door for the admission of the passage from the learned treatise when he cited the treatise on cross-examination as authoritative in response to a question asked by the Appellees. "A party cannot complain because the adverse party has been permitted to introduce immaterial or incompetent evidence if he has opened the door for it * * * by himself introducing similar evidence so that the evidence in question serves merely to explain or rebut that offered on his part." 5 Ohio Jurisprudence 3d (1978) 99-100, Section 544, citing Krause v. Morgan (1895), 53 Ohio St. 26. We find that the door was opened for rebuttal evidence from the learned treatise by reason of Dr. Pyles's own testimony. SeeGollihue v. Consolidated Railroad Corp. (1997), 120 Ohio App.3d 378. Consequently, we cannot find that the trial court abused its discretion in allowing Dr. Michael to read from the learned treatise. Accordingly, the first assignment of error of the Appellants is overruled.
 ASSIGNMENT OF ERROR NO. II It is error to permit the introduction of hearsay letters and medical reports as exhibits in cross-examination when the letters and medical reports are never demonstrated to be business records.
The Appellants next contend that the trial court erred in admitting Exhibits C, D, and G to the prejudice of Appellant.
As we previously stated, the decision whether to admit evidence rests within the sound discretion of the trial court and such a determination will not be disturbed on appeal absent a clear showing of an abuse of discretion. See Peters v. Ohio StateLottery Comm. (1992), 63 Ohio St.3d 296, 299.
 "Generally, authenticated medical records are admissible at trial" as a hearsay exception. State v. Humphries (1992), 79 Ohio App.3d 589, 595, citing Hunt v. Mayfield (1989), 65 Ohio App.3d 349, 352. Evid. R. 802 provides:
 Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio.
Evid. R. 801(C) defines hearsay as follows: "`Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."
Evid. R. 803 creates certain exceptions to the hearsay rule, including the business records exception contained in paragraph (6) of the rule:
 Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or the circumstances of preparation lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
See, also, R.C. 2317.40.
In addition, the Staff Note to Evid. R. 803(6) reads in relevant part:
 The business records exception derives its circumstantial guaranty of trustworthiness from the fact that records made in the ordinary course of business by employees under an obligation to make such records will be accurate because business cannot, as a matter of course, function without accurate records.
 The record keeper, absent self-authenticating provisions, must testify that the records are such as are routinely kept as a part of the business and that the entrant (declarant) is under a duty to record the items contained in the record, and that the records are maintained accurately in accordance with a custom or routine.
 Weis v. Weis (1947), 147 Ohio St. 416, 425, provides that the purpose in part of the medical records exception is "to avoid the necessity and thereby the expense, inconvenience and sometimes the impossibility of calling as witnesses the attendants, nurses and physicians who have collaborated to make the hospital record of a patient." (Citations omitted.)
Moreover, the phrase "qualified witness" in Evid. R. 803(6) should be broadly interpreted. State v. Vrona (1988), 47 Ohio App.3d 145,148, citing 1 Weissenberger's Ohio Evidence (1985) 75, Section 803.79.
 The witness providing the foundation need not have firsthand knowledge of the transaction. Rather, it must be demonstrated that the witness is sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Rule 803(6).
 Vrona, 47 Ohio App.3d at 148 (citation omitted).
As such, before a business record can be admitted into evidence under this exception, the records must be properly authenticated. Evid. R. 803(6). The Appellees were required to authenticate Exhibits C, D, and G through the testimony of the custodian or the person who prepared or supervised the preparation of each medical record. Alternatively, the language "or as provided by Rule 901(B)(10)" permits the admission of records under R.C. 2317.422 (verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution), which eliminates the necessity for the in-court testimony of the custodian. See Humphries, supra.
We agree with the Appellants that Exhibits C, D, and G were not properly authenticated as required by Evid. R. 803(6). First, Exhibit C is a letter written by Dr. MacNealy to Dr. Pyles dated April 26, 1994. In the first line of the letter, Dr. MacNealy writes that "[t]he following is a report of my findings of your recent neurological examination and evaluation." Exhibit C was contained in Dr. Santanello's office records and Dr. Santanello testified on behalf of the Appellants. Dr. Santanello testified that Dr. Pyles brought Exhibit C to him for his consideration and his use in treating Dr. Pyles. Dr. Santanello also stated that the letter accurately described Dr. Pyles. Exhibit C, however, did not contain the diagnostic findings of Dr. Santanello.
The letter may have been made in the regular course of business of Dr. MacNealy; however, there was neither authenticating testimony to that fact, nor to the mode of preparation of the letter. See Hytha v. Schwendeman (1974),40 Ohio App.2d 478, 486. For instance, the report of one physician given to another "is not a record made in the ordinary course of business of the recipient doctor." Id. at 490 (Whiteside, J., concurring). See, also, Hunt, supra. As stated, to introduce the letter the Appellees were required to present the keeper of the records of which it was a part, who would testify that (1) the document was a record routinely kept in the business, (2) the declarant whose assertion is related in the document is under a duty to record the matter contained in it, and (3) the record was maintained in accordance with a custom or routine. See Weissenberger's Ohio Evidence Courtroom Manuel (1999) 356. When the document is not authenticated by those means, it is inadmissible. Humphries, supra. As the record fails to demonstrate the authentication of the letter, it was error for the trial court to admit the letter over the objection of the Appellants.
Second, Exhibit D is a medical report for Dr. Pyles by Dr. Singer dated February 18, 1992. In the report, Dr. Singer states: "Currently it is my opinion that he [Dr. Pyles] should not be working at all." After a review of the transcript, we find that a lack of authentication existed at trial to admit this medical report. Hytha, supra. This report may have been a medical record of Dr. Singer; however, again, there was neither authenticating testimony to that fact nor to the mode of preparation of the report. Id. Accordingly, it was error for the trial court to admit Exhibit D letter over the objection of the Appellants.
Third, Exhibit G is a letter from Dr. Singer to Peter Van Arsdale dated August 3, 1994. In the letter, Dr. Singer states: "It is my opinion that Dr. Pyles is 100% disabled from employment of Family Practice at this time and will continue to be so." The Appellees argue that the Appellants did not object to this exhibit, but we disagree. Both the trial court and the Appellees allowed the Appellants to enter his objections after the examination of Dr. Santanello. After the testimony of Dr. Santanello, the Appellants stated their objections to Exhibits A, B, C, and D. As the discussion ensued, the Appellants also stated the reasons for their objections and included an objection to Exhibit G. Accordingly, we will consider the Appellants contentions. As with Exhibit D, there was a lack of authentication of Exhibit G at trial. The letter probably would have been admissible had the Appellees sought the testimony of the doctor who prepared the letter or obtained the necessary certification pursuant to R.C. 2317.422. Humphries, supra.
However, they did not. Thus, it was error for the trial court to admit the exhibit over the objection of the Appellants.
However, the existence of error does not necessarily require a reversal unless such error is prejudicial to the complaining party. The error must affect the substantial rights of the complaining party or substantial justice must not have been done. Civ.R. 61; Seley v. G.D. Searle Co. (1981), 67 Ohio St.2d 192. The Appellants argue that the errors described in admitting Exhibits C, D, and G are prejudicial. In support of their argument, the Appellants state that the issue at trial was whether any injury was caused to Dr. Pyles by the surgery performed by Dr. Michael. After a review of the record, we find that the record readily demonstrates that the alleged errors were not prejudicial. We find that Exhibits C, D, and G were merely cumulative and corroborative of the testimony of other witnesses and exhibits which demonstrate that Dr. Pyles was injured and in pain prior to the surgery performed by Dr. Michael.
For instance, the Appellants did not object to Exhibit I. Exhibit I is a letter from Dr. Santanello to Northwestern Mutual Life dated November 7, 1994. In the letter, Dr. Santanello states: "Presently he [Dr. Pyles] continues to have severe low back problems especially right lower extremity weakness and severe low back and lower extremity pain as well as thoracic spinal pain. He has since returned to work on a very limited basis approximately three times per week for 2-3 hours per day." Dr. Santanello also states: "Please keep in mind that since this patient's second spinal surgery he has shown only slight improvement in his pain." In addition, Exhibit J consists of the progress notes of Dr. MacNealy dated December 15, 1994. The Appellants also failed to raise an objection to this exhibit. In the progress notes, Dr. MacNealy wrote that Dr. Pyles has had "additional complications as a result of a new disk rupture." Dr. MacNealy also made the following list:
Chronic Pain
Progressive Spinal Degeneration and
Secondary muscular atrophy affecting both legs.
 Moreover, Exhibit M is a letter written by Dr. Santanello dated March 6, 1995 to the Lima Bureau of Workers Compensation which states that Dr. Pyles has "constant pain and weakness in his low back and lower extremities. This is very difficulty [sic] for him to ambulate without excruciating discomfort." Additionally, Exhibit 7 of the Appellants is a report by Dr. Cooley dated January 19, 1995 which states: "He [Dr. Pyles] is now complaining of lower thoracic, upper lumbar area region pain and is brought into the hospital for conservative treatment of this * * *."
As demonstrated, the other exhibits admitted at trial documented the condition of Dr. Pyles prior to the surgery by Dr. Michael on March 15, 1995. Thus, from our review of the record, we find that Exhibits C, D, and G were merely cumulative and the admittance of the exhibits did not constitute prejudicial error. See State v. Davis (1991), 62 Ohio St.3d 326, 342-43. Accordingly, based upon the foregoing reasons, we overrule Appellant's second assignment of error and the judgment of the trial court is affirmed.
Judgment affirmed.
 BRYANT, P.J., and SHAW, J., concur.
[1] At trial, Dr. Pyles alleged that Dr. Michael stated that he was going to perform surgery on Dr. Pyles to remove a herniated disk at L2/3 which involved a two-inch incision directly over the disc to be excised. Dr. Michael actually performed surgery beginning at T11/12 and came down to the disc. Dr. Pyles claims that he would not have consented to the surgery at T11/12. Dr. Pyles also alleged that the surgery performed by Dr. Michael caused him harm.
[2] We note that our decision is in agreement with the new Evid. R. 706(B) which became effective after the trial in this matter on July 1, 1998. Evid. R. 706 provides:
 Statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art are admissible for impeachment if the publication is either of the following:
 (A) Relied upon by an expert witness in reaching an opinion.
 (B) Established as reliable authority (1) by the testimony or admission of the witness, (2) by other expert testimony, or (3) by judicial notice.
If admitted for impeachment, the statements may be read into evidence but shall not be received as exhibits.