[Cite as *State v. Collins*, 2011-Ohio-6365.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO                                  )        CASE NO. 10 CO 10
                                               )
    PLAINTIFF-APPELLEE            )
                                               )
VS.                                            )        OPINION
                                               )
EARL COLLINS                                   )
                                               )
    DEFENDANT-APPELLANT           )

CHARACTER OF PROCEEDINGS:        Appeal from the Court of Common Pleas
                                 of Columbiana County, Ohio
                                 Case No. 09 CR 184

JUDGMENT:                        Affirmed.

APPEARANCES:

For Plaintiff-Appellee:          Atty. Robert Herron
                                 Columbiana County Prosecutor
                                 Atty. Timothy J. McNicol
                                 Assistant Prosecuting Attorney
                                 105 South Market Street
                                 Lisbon, Ohio  44432

For Defendant-Appellant:         Atty. Douglas A. King
                                 Hartford, Dickey & King Co., LPA
                                 91 West Taggart Street
                                 P.O. Box 85
                                 East Palestine, Ohio  44113

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

                                 Dated:  December 9, 2011

WAITE, P.J.

{1}    Appellant Earl Collins appeals the December 17, 2009 jury verdict of the Columbiana County Court of Common Pleas convicting him on one count of rape with an age specification.  The incident occurred during the late evening of March 27, 2008, when Appellant arrived at the home of his friend Lisa Soles to babysit her daughter, M.S., then nearly three years old.  At some time that evening Appellant removed the child from her room, took her to her mother's room, removed her pajama bottoms, and "tickled" her vaginal and anal areas with his tongue before returning her to her bed.  Ms. Soles overheard M.S. talking to Appellant about the incident the next morning and confronted him.  Over the course of that day (March 28, 2008) and during the following week Appellant gave varying explanations for the incidents of that night, threatened suicide, and refused to disclose his location to friends and to law enforcement.  Appellant then fled the state for an extended period.  On March 28, 2008 M.S.'s mother consulted her pediatrician; the incident was reported to the Columbiana County Department of Jobs and Family Services, the police, and the Tri-County Child Advocacy Center, where M.S. was later evaluated.  When Appellant returned to the area, he was indicted on one count of rape with an age specification.  Appellant was tried and convicted on that count and sentenced to an indefinite term of fifteen years to life.

{2}    On appeal Appellant's first and fifth assignments of error allege violations of his Fifth Amendment rights based on comments that Appellant alleges touch on his pre-arrest silence.  His second assignment challenges the court's decision finding M.S. competent to testify.  His third and fourth assignments argue

Sixth Amendment violations in the deposition of M.S. and in testimony given by Ms. Soles and Dr. Paul McPherson. Appellant's sixth assignment of error alleges the jury was not properly instructed on the state's burden of proof. His seventh and eight assignments of error challenge the sufficiency and weight of the evidence. His final, ninth, assignment of error alleges that cumulative error deprived him of a fair trial. All of Appellant's assignments are without merit and the judgment of the trial court is hereby affirmed.

## HISTORY OF THE CASE

{3}    On the evening of March 27, 2008, Lisa Soles had arranged to go out with a friend. Both M.S. and the friend's son stayed together at Ms. Soles's house. Appellant, Earl Collins, was a long-time friend of Ms. Soles and was at that time frequently spending the night on her couch because he did not have a permanent home. By prior arrangement Appellant was to watch both children that night. When he arrived, around ten that evening, both children were asleep. Ms. Soles and her friend left and Ms. Soles returned alone around midnight. When she entered the house she asked Appellant if the children had been quiet and was told the children had slept the whole time. (Tr. Vol. I, p. 167.) While making breakfast the next morning, Ms. Soles heard her daughter exclaim to Appellant: "Earl, you licked my peepee. Earl you licked my butt." (Tr. Vol. I, p. 166.) Ms. Soles confronted Appellant, who claimed M.S. had defecated in her underwear the night before and that he cleaned her up, and had "wiped" her, not "licked" her. Ms. Soles noticed that M.S. was still wearing the same underwear she had been wearing when she was put

to bed the night before. Ms. Soles asked Appellant about the underwear, and he said the stool was so hard he had removed it from M.S.'s underwear, but that there was no mark, so he'd left the same underwear on.

{4}     After talking with her daughter Ms. Soles went to her own room and found M.S.'s pajama bottoms on the floor near her bed. Ms. Soles called Appellant and told him what her daughter had said; he responded that he wouldn't watch the child anymore "if that's the things she's going to say." Ms. Soles assured him he would no longer be near the child again. (Tr. Vol. I, p. 171.) Ms. Soles then called her daughter's pediatrician, Mahoning County Children Services, the child's father, and a friend, Pam Sturgeon, who she believed would know what to do because of her training as a teacher's aide. M.S. was examined by Ms. Soles, who is a nurse. An appointment was scheduled for M.S. with the Child Advocacy Center. Ms. Soles decided not to take M.S. to the emergency room because she did not see any bleeding and she did not believe, based on M.S.'s statements, that there had been penetration. (Tr. Vol. I, p. 180.)

{5}     During the course of the day Ms. Soles received a second phone call from Appellant, during which he said that, "* * * if he did it, it was unintentional. He doesn't remember. He may have been blacked out or passed out." (Tr. Vol. I, p. 175.) When Ms. Soles asked why he took M.S. out of her bed he replied that the bed was too low to change her in. Ms. Soles testified at trial that M.S. was wearing the same underwear the next morning that she had worn to sleep. She also confirmed that she found M.S.'s pajama sweat pants, which M.S. had also worn to sleep, on the

floor in her own bedroom that morning, not M.S.'s. Appellant called her one last time that day and repeated his assertions "'* * * again, if I did it, it was unintentionable [sic] – unintentional. I'm an asshole and I deserve to die if I did it.* * * 'Do I need to worry about somebody slashing my throat?'" (Tr. Vol. I, p. 178.) Ms. Soles did not see or hear from Appellant again until the next fall during court proceedings, more than a year later.

{6} Ms. Soles went to the police department to report the incident. Ms. Sturgeon, a friend of both Ms. Soles and Appellant, accompanied Ms. Soles and allowed the police to record a message left by Appellant on her phone. The message, which indicated that Appellant was going to harm himself, initiated a series of phone calls between various police officers, Appellant, and Appellant's ex-wife Sheila Reidy. The phone calls culminated with a recorded conversation between Appellant and Sergeant Dickey in which Appellant stated that he would not harm himself. (Tr. Vol. I, p. 284.) This conversation was the last contact between the police department and Appellant until September 30, 2009 when he gave his brother's name and birth date instead of his own during a traffic stop. According to the testimony of various witnesses, Appellant left Ohio for Texas and remained there for more than a year. Although he may have returned for holidays and may have spent some time in a camper somewhere in Columbiana County during that period, law enforcement was not aware of his presence. (Tr. Vol. II, p. 264.) Witnesses agree that he was absent from the places he usually frequented and many of his

friends did not see him at all for the entire period from March 28, 2008 until he was arrested in September of 2009.

{7} When Appellant left Ms. Soles's house on March 28, 2008, he met up with Bob Lalley who describes himself as one of Appellant's "top five" friends at the time. He spent the day with Mr. Lalley, an upholsterer for whom he occasionally worked, on a furniture pick-up. Mr. Lalley testified that Appellant was unusually quiet, left abruptly toward the end of the day, and later called him and said "I did something I could go to prison for * * * I touched a little girl inappropriately." (Tr. Vol. II, p. 292.) Mr. Lalley asked Appellant where he was, but he refused to disclose his location. Appellant called Mr. Lalley one last time about a week later, and accused him of spreading rumors. Mr. Lalley responded that he had only repeated what Appellant had told him. (Tr. Vol. II, p. 294.) Mr. Lalley did not see or hear from Appellant again until trial.

{8} In addition to occasionally working for Mr. Lalley, Appellant was a regular employee at United Technical Support Services. His supervisor, Ronald Duffey, testified that he was a good worker, and that in early May, Appellant requested an out-of-state transfer to Georgia. Appellant was approved for the transfer and on May 21, 2008 received a $2500.00 check from his employer for relocation expenses. Mr. Duffey was surprised when Appellant called three days later and resigned. Appellant never returned the check. About the same time, on May 23, 2008, Appellant agreed to meet with Bettina Dillworth, an investigator from the prosecutor's office. Appellant said he would meet Ms. Dillworth at the police

department on May 24, 2008 at 1:00 p.m., the same day he resigned. Appellant did not keep the appointment. More than a year later, on September 30, 2009, Appellant was riding in the back of a friend's pick-up truck. When the truck was stopped and the occupants asked to identify themselves Appellant gave his brother's name, "Chuck," and his brother's birth date. (Tr. Vol. I, p. 223.) The officer allowed him to correct his response, and then arrested him on the outstanding warrant. (Tr. Vol. I, pp. 224-225.)

## PROCEDURAL HISTORY

{9} Appellant was indicted by the Columbiana County Grand Jury on August 26, 2009 for the conduct alleged to have occurred on March 27, 2008. The indictment identified a single count of rape in violation of R.C. 2907.02 (A)(1)(b), a first degree felony, which provides: "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies * * * (b) [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." A jury trial was conducted on December 16 and 17, 2009. Bettina Dillworth, Lisa Soles, Linda Eveleth, Officer Richard Pillsbury, Deputy William McGee, Pam Sturgeon, Sheila Reidy, Sergeant Kevin Dickey, Robert Lalley, Ronald Duffey, and Glenn Verden testified at trial for the prosecution. The video depositions of M.S. and Dr. Paul McPherson were played for the jury and introduced into evidence. Donald Reidy testified for the defense. After

evidentiary rulings, the defense moved for acquittal under Rule 29.  The motion was denied.

{10}    A verdict of guilty was returned by the jury on December 17, 2009.  The jury was polled at the request of defense counsel.  On December 22, 2009, judgment was entered and the sentencing disposition scheduled.  The sentencing hearing was conducted on February 12, 2010.  On February 19, 2010 the sentence, an indefinite term of fifteen (15) years to life, with five years of post-release control and required registry as a "Tier III Sexual Offender," was entered in the record.  Appellant was given credit for one hundred and thirty-six (136) days served.  Appellant filed his timely appeal on March 2, 2010.

<u>ASSIGNMENT OF ERROR NO. 1</u>

{11}    "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE PROSECUTOR TO INTRODUCE EVIDENCE OF DEFENDANT/APPELLANT'S ASSERTION OF HIS FIFTH AMENDMENT RIGHTS AND BY IMPROPER COMMENT THEREON."

{12}    In this first assignment of error, Appellant cites five instances he alleges amount to Fifth Amendment violations made during the state's case-in-chief and three statements made by the prosecutor in closing he claims are not only violations of his Fifth Amendment rights, but also are due process violations.  Of these, the statements made during the trial either do not constitute references to protected silence at all or were introduced, not by the state, but by defense.  Only the statements made in closing actually touch on Appellant's rights to silence.

Statements made in closing are not substantive evidence and are not evaluated under the same rule as statements made during the case-in-chief.

{13} In Appellant's fifth assignment, he argues prosecutorial misconduct occurred in connection with these same statements from his first assignment. Because the subject matter of Appellant's first and fifth assignments overlap, we will address these assignments out of turn.

{14} As to his first assignment of error, the Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The protections of the Fifth Amendment apply to the states through the Fourteenth Amendment. *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, citing *Malloy v. Hogan* (1964), 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653. The Ohio Supreme Court considered the Fifth Amendment implications of pre-*Miranda* silence in *Leach*. The *Leach* Court, noting that the United States Supreme Court had not yet ruled on the issue, held that "[u]se of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment" because "the use of [the defendant's] pre-arrest silence in the state's case-in-chief as *substantive* evidence of guilt subverts the policies behind the Fifth Amendment." Id. at syllabus; ¶30.

{15} *Leach* involved charges of attempted rape, gross sexual imposition and kidnapping. The individuals involved had been given access to a third party's house while the homeowner was away, but appear to have been instructed not to be there at the same time. There was no physical evidence offered at trial and the case

rested solely on the testimony of the individuals concerned. Following the incident, the homeowner, a friend of the defendant, told the police that the defendant wanted to speak with them and gave the police his phone number. At trial the police sergeant was permitted to testify that he used the phone number provided to contact the defendant. When the sergeant spoke with the defendant, he set up an appointment for the defendant to come in and talk to him in person. However, the defendant did not keep the appointment and instead left a message on the sergeant's phone indicating that he "wanted to speak with an attorney before talking with the police." Id. ¶5.

**{16}** The Supreme Court found that defendant's decision to speak with an attorney was an invocation of his Fifth Amendment rights and that testimony during the state's case in chief concerning a defendant's invocation of the Fifth Amendment is a violation of that Amendment's guarantee against self-incrimination. The Court reasoned that allowing the "[u]se of pre-arrest silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." Id. at ¶31. The Court explained that "[t]o hold otherwise would encourage improper police tactics, as officers would have reason to delay administering *Miranda* warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt." Id.

**{17}** The Court distinguished the use of pre-arrest silence in the case in chief from pre-arrest silence used to impeach. The latter is allowed, because

impeachment necessarily means the defendant has elected to set aside the protection and to testify. "[U]se of pre-arrest silence as impeachment evidence is permitted because it furthers the truth-seeking process. Otherwise, a criminal defendant would be provided an opportunity to perjure himself at trial, and the state would be powerless to correct the record." Id. at ¶33. The Court also distinguished testimony concerning the defendant's decision to exercise his right to silence, and to speak to an attorney, from testimony concerning the fact that the defendant did not keep an appointment he scheduled with the police. The Court considered and rejected a "course of the investigation" explanation for the testimony concerning defendant's decision to consult an attorney; importantly, however it did determine that had the sergeant's testimony in *Leach* been limited to the fact that an appointment had been made, but had not been kept, there would be no Fifth Amendment violation. Id. at ¶32.

{18} The *Leach* Court found that testimony reflecting a defendant's decision to speak to an attorney rather than talk to the police was "intended to lead the jury to one conclusion * * * that innocent people speak to police to clear up misunderstandings, while guilty people consult with their attorneys." Id. The Court noted repeated references by the state, first in opening, then at multiple points during the case-in-chief and in closing, to the fact that the defendant chose to speak to an attorney rather than talk to the police. The Court concluded "the state's substantive use of the defendant's pre-arrest, pre-*Miranda*, silence substantially subverts the policies behind the Fifth Amendment privilege against self-incrimination and is not a

legitimate governmental practice. * * * Therefore, we hold that use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination. Because the evidence of guilt was not overwhelming in this case, the admission of defendant's pre-arrest pre-*Miranda* silence was clearly prejudicial." Id. at ¶37-38. The *Leach* Court remanded the matter for a new trial.

{19} In the matter at bar, there are certainly some factual similarities with *Leach*. In neither case did the appellant take the stand. In the matter at bar there was no physical evidence, although the events described in both cases do not suggest an abundance of physical evidence existed in either case. Here, Appellant had been told that the police wanted to talk to him. He called the police to let them know that he did not intend to commit suicide; but did not discuss with them the facts of the case or assert his innocence. Similarly, in *Leach* the defendant spoke to police but did not discuss the incident with law enforcement. However, in *Leach*, the defendant actually said that he must consult a lawyer prior to talking to police, specifically asserting his *Miranda* rights in advance. The state then chose to inform the court, several times in testimony, that the *Leach* defendant chose to speak to an attorney rather than to the police. This is the crucial divergence in facts. Mr. Leach directly asserted his Fifth Amendment rights when he refused to discuss the actual incidents with the police, instead, clearly stating that he wanted to speak to an attorney, first. In the matter before us, no such clear action was taken by Appellant. In fact, at no time did police even get as far in their conversations as to question

Appellant about the incident. Their efforts were directed towards setting up a meeting with Appellant to further their investigation and their testimony was limited to these efforts.

{20} During the state's case-in-chief Officer Pillsbury testified that on March 28, 2008, after he and Patrolman Moore drove to several locations looking for Appellant, he spoke with Appellant on the phone. In response to the prosecutor's questions, Officer Pillsbury carefully explained that not only was he not the investigating officer on the case, he was in fact off-duty and had been called in to assist Patrolman Moore because he had a social relationship with Appellant. Officer Pillsbury further testified that when he was called in and interacted with Appellant, it was at that point solely because Appellant's suicidal statements had been reported to the police resulting in the need to investigate the potential suicide warning. That night when Officer Pillsbury finally spoke to Appellant, he told him that there were no warrants for his arrest and that he and Patrolman Moore were solely concerned about his physical well being. He also told Appellant that there would, in fact, be an investigation into the rape allegations and that the police would want to talk to him, but that their primary concern at that time was in making sure Appellant would not harm himself. Officer Pillsbury stated that this conversation was the last he had with Appellant, and that he had not spoken with him as a law enforcement officer or as a friend since that night. (Tr. Vol. I, pp. 215-217.) He went on to describe the nature of his relationship with Appellant and his lack of involvement with the rape investigation beyond March 28, 2008.

**{21}** Defense counsel did not object to Officer Pillbury's testimony. On appeal, Appellant raises as error Officer Pillbury's response to defense counsel's question: "Officer, I just have one question for you. You believe that it was unusual that Mr. Collins didn't come around to the Moose Club with these accusations out there? Is that what you think?" (Tr. Vol. I, p. 218.) To which Officer Pillsbury responded "[w]ell, if he was innocent of them, then I see no reason why he didn't come in, speak to the police, and continue his life as normal." Id. Rather than object or request a corrective instruction, defense counsel continued, "[o]kay, You don't think this is embarrassing for someone, maybe they wouldn't want to be around people or see people, have people ask them about it?" (Tr. Vol. I, p. 218.) Hence, the only damaging testimony was actually in answer to Appellant's own counsel's question. Testimony elicited by the defense during the state's case-in-chief cannot be construed as an improper attempt by the state to make probative use of a defendant's silence. This is not the type of comment *Leach* is designed to protect against. To hold otherwise would allow enterprising defense counsel to create reversible error by deliberately eliciting improper testimony from the state's witnesses. On appeal, the state cannot be held responsible for testimony sought and obtained by the defense.

**{22}** Similarly, Appellant complains of statements made during the testimony of Bettina Dillworth, an investigator from the prosecutor's office who attempted to interview Appellant before he left the state. A significant portion of what Appellant describes as testimony that Appellant hindered the investigation into the matter and

that his failure to give the police a statement delayed his indictment in this matter, were again responses to defense counsel's questions. Defense counsel asked, "just, for clarification, you had indicated that the case wasn't taken to grand jury because you were waiting on test results, waiting on statements * * * [w]as Mr. Collins' [sic] statement necessary to take this case to grand jury?" (Tr. Vol. II, p. 319.) To which Ms. Dillworth responded that Appellant's statement and his DNA would have been "very helpful" and that because they were unable to locate him they could not request DNA which they often get "near the beginning of the case" and that both problems "played in the timeline" of the case. (Tr. Vol. II., pp. 319-320.) Not only was this testimony not elicited by the prosecutor, it is the type of "course of investigation" testimony *Leach* allows and is independently relevant to explain the passage of time between the incident, the indictment, and the arrest.

**{23}** The statements made by Officer Pillsbury and Ms. Dillworth are not examples of the improper use of a defendant's protected silence that *Leach* prohibits. No objection was made to any of the statements and, in fact, any damaging testimony was solicited by Appellant's own counsel.

**{24}** Turning to the comments that were actually solicited by the state, Appellant argues that comments by other officers and Ms. Dillworth constituted error because they impinged on his Fifth Amendment rights to protected silence. Appellant complains that Sergeant Dickey testified that no one in the department was contacted by Appellant during the investigation despite the fact that the sergeant encouraged Appellant's ex-wife to have him get in touch with police. (Tr. Vol. II, p. 284.) He also

takes issue with the prosecutor's investigator's comments. Ms. Dillworth testified about her attempts to set up an appointment with Appellant. She became involved with the case when she received a request for assistance from an intake worker at Children Services. Ms. Dillworth said she did receive a phone call from Appellant on May 23, 2008. Appellant asked her if she worked for the prosecutor's office. When she said yes, she asked to set up an appointment to "talk about some things." Appellant responded that "it's all bullshit" and asked if he would be arrested when they met. Ms. Dillworth told him that the case was at an investigative stage, they wanted his perspective, and that he would be able to leave. The two agreed to meet on May 24, 2008, in the afternoon. (Tr. Vol. II, pp. 310-311.) Appellant did not keep the appointment. This is the full extent of Ms. Dillworth's testimony and is limited solely to the course of the investigation. Unlike the situation in *Leach*, where the appellant was asked questions relevant to the incident and refused to answer because he wished to talk to a lawyer, the scenario with Ms. Dillworth is exactly the fact pattern the *Leach* Court specifically held that it would condone: an initial contact with a defendant to make an appointment that the defendant did not keep. *Leach* at ¶32. We also note that Ms. Dillworth does not have arrest powers and any discussion with her, pre-arrest, must be entirely noncustodial.

{25} While Sergeant Dickey's testimony, in response to the state's questions, appears to be entirely gratuitous on the part of the state, once again, his comments appear to be directed at the lack of cooperation in even an initial investigation. His testimony that Appellant's ex-wife was encouraged by police to

have Appellant contact them to no avail appears to be confined to an appointment not kept. To the extent it overreaches because it implies Appellant should have contacted the department and did not, it cannot be said to rise to the level of a *Leach* violation. There is law in this state holding that law-enforcement testimony describing pre-arrest, pre-*Miranda* discussions with defendants including the defendant's decision not to answer certain questions, has been distinguished and exempted from *Leach* prohibitions. *State v. Onunwor*, 8th Dist. No. 93937, 2010-Ohio-5587, ¶55. In *Onunwor*, as in the case at bar, the defendant initially made voluntary contact with the police. In *Onunwor*, the defendant actually met with the investigating officer. During his voluntary interview concerning a shooting, the defendant answered some questions but declined to answer others. The defendant did not testify at trial. The interviewing officer was allowed to testify as to the initial, voluntary contact, and to the fact that in response to questions including do you want "to get to the bottom of who killed [your] mother?" defendant "fell silent." Id. at ¶50. Sergeant Dickey's testimony to the effect that Appellant would not even make an appointment to talk with investigating officers falls far short of the police testimony permitted by *Onunwor*. Thus, it cannot possibly rise to the level of that prohibited in *Leach*.

**{26}** Additionally, the issues to be resolved at trial here included the length of time between the complaint, the indictment, and the arrest as well as the fact that although Ms. Soles's bed sheets were later collected for DNA analysis, no evidence was initially collected, and no interviews were conducted by the Columbiana County Police Department. During trial, defense counsel elicited testimony from various

witnesses concerning threats alleged to have been made against Appellant by M.S.'s family. This testimony was relevant to the defense's explanation of his flight to Texas as a fear of reprisal rather than consciousness of guilt. Under the circumstances, testimony from the various officers concerning the lack of further contact with Appellant is relevant both to the fact that none of the alleged threats were reported and as an explanation of the delay between the incident and the indictment.

{27} The worst construction of Sergeant Dickey's testimony that Appellant made no further contact with either him or anyone else in the police department is akin to the interviewer's testimony in *Onunwor* that defendant was "unresponsive" to specific questions during his voluntary interview. Both his testimony and Ms. Dillworth's are also independently relevant to the state's case-in-chief. Appellant fled the jurisdiction before a complete investigation of the incident. The fact of Appellant's departure and prolonged absence is independently relevant to the timeframe of the criminal case. In contrast to *Leach*, where there was very little gap between complaint and indictment and no flight, the officers' testimony is independently relevant to the specific facts of the matter at bar. Because the testimony elicited by the prosecutor in the instant matter had multiple, legitimate, purposes in the context of the other issues addressed at trial, we cannot find that it was solely relevant to an impermissible inference of guilt. Unlike *Leach*, the testimony introduced by the state at trial was not "clearly meant to allow the jury to infer [Appellant's] guilt." For this reason, and because the testimony did not directly refer to Appellant's assertion of his right to silence, but, instead, supported a "course of investigation" argument, we

cannot find that inclusion of this testimony amounts to a violation of the Fifth Amendment. The testimony, while questionable, had independent relevance and does not constitute error. *Leach* at ¶25.

**{28}** With regard to the statements made in the state's case-in-chief Appellant's first assignment of error is overruled. We will address statements made during closing arguments in Appellant's fifth assignment of error out of order.

### ASSIGNMENT OF ERROR NO. 5

**{29}** "DEFENDANT/APPELLANT WAS DENIED HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL BECAUSE OF IMPROPER COMMENTS BY THE PROSECUTION DURING CLOSING ARGUMENT."

**{30}** Appellant's fifth assignment of error restates the Fifth Amendment and introduces due process challenges to the statements made during the state's closing. Neither the Ohio Supreme Court nor the United States Supreme Court has ruled on whether the use of pre-arrest silence constitutes a due process violation. The Ohio Supreme Court declined to reach the issue in *Leach* because it ordered a new trial based on violations of the Fifth Amendment, alone. *Leach*, ¶37, fn1. Whether the conduct identified is a Fifth Amendment and/or a due process violation, the standard of review for misconduct is the same.

**{31}** We review allegations of prosecutorial misconduct by first determining whether the actions by the prosecution were improper, and, if so, whether they prejudiced Appellant's substantial rights. *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, 739 N.E.2d 749. "In determining whether the prosecutor's statements affected a

substantial right of the defendant, an appellate court should consider the following factors: '(1) the nature of the remarks; (2) whether an objection was made by defense counsel; (3) whether the court gave any corrective instructions; and (4) the strength of the evidence presented against the defendant.'" *State v. Scott*, 7th Dist. No. 07 MA 152, 2009-Ohio-4961, ¶85, quoting *State v. Breland*, 11th Dist. No. 2003-A-0066, 2004-Ohio-7238, ¶29.

**{32}** Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived Appellant of a fair trial based on the entire record. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293; *State v. Skidmore*, 7th Dist. No. 08 MA 165, 2010-Ohio-2846, ¶44; appeal not allowed, 2010-Ohio-4928, 126 Ohio St.3d 1602, 935 N.E.2d 47. The latitude afforded prosecutors in closing argument does not "'encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial' or 'allud[ing] to matters not supported by admissible evidence.'" *State v. Freeman* (2000), 138 Ohio App.3d 408, 419, 741 N.E.2d 566, quoting *State v. Hart* (1994), 94 Ohio App.3d 665, 671, 641 N.E.2d 755. A closing argument is considered in its entirety to determine whether it was prejudicial. *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 407 N.E.2d 1268; *Skidmore*, ¶53. Finally, the test for prosecutorial misconduct focuses on "the fairness of the trial, not the culpability of the prosecutor." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶91, 781 N.E.2d 88.

(A)  General Misconduct.

**{33}**  In Appellant's fifth assignment of error he alleges prosecutorial misconduct in the closing argument.  Appellant first argues that the state improperly appealed to the emotions of the jury by referencing their personal experience of children and reminding the jury how "tough" testifying had been for M.S., thus, intending to inflame the passions of the jury.  No objection was raised before the trial court, therefore Appellant has waived all but a plain error review.  Crim.R. 52(B).  The plain error doctrine requires that we find an obvious error that affected substantial rights under exceptional circumstances.  Crim.R. 52(B); *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.  It cannot be utilized unless the outcome clearly would have been different if not for the error.  *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043.  Neither of the instances Appellant raises constitutes plain error.

**{34}**  Appellant's arguments substantively mischaracterize these statements.  The prosecution, in response to testimony concerning the possibility that the child witness may have been coached to describe misconduct, referred to the difficulty the court, the prosecutor, defense counsel, and other witnesses had when questioning M.S.  M.S. was an active child, fidgeting and kicking her feet while seated to answer questions, and easily distracted.  The state's remark in closing was directed to how difficult it was to get M.S. to focus and the inference made was that it would be difficult to coach such a child.  The prosecution's reference to the jury's "experiences with children" was a request that they evaluate M.S.'s testimony describing the act in

the context of their experience of children. It was intended to highlight the fact that the acts M.S. described were "not concepts that are normal for children to talk about * * [t]hese are foreign ideas that children have no idea of their significance." (Tr. Vol. II, p. 359.) Comment upon testimony is "within the bounds of the prosecutor's wide latitude in closing argument." *State v. Davis* (1996), 76 Ohio St.3d 107, 119, 666 N.E.2d 1099. In context, neither statement identified by Appellant constitutes misconduct. There is no need for the court to "invoke a plain error analysis" if none "of the complained of prosecutorial comments constituted misconduct." Id. The state's comments in closing concerning M.S.'s demeanor and testimony were not an improper appeal to emotion, and did not constitute error.

{35} Appellant also argues that the state's comment on the testimony given by Ms. Dillworth that established Appellant's failure to keep his appointment with her was misconduct. Under *Leach*, which Appellant mis-cites in support of this proposition, such testimony is explicitly allowed: "Sergeant Corbett's testimony that he had made an appointment to meet with Leach to discuss the case but that the appointment was not kept is legitimate." *Leach*, at ¶32. Since the testimony itself was appropriate, comment on that testimony is equally appropriate. *Davis*, supra, 119. These remarks did not constitute misconduct, therefore no error analysis is required. Id.

(B) Fifth Amendment Violations.

{36} Finally, Appellant also argues that use of the same statements alleged to be Fifth Amendment violations in his first assignment of error by the prosecutor in

closing also constitute due process violations. In his closing argument the prosecutor referred to the testimony given by Officer Pillsbury and Sergeant Dickey. With reference to Sergeant Dickey's testimony the prosecutor stated, "[m]ost importantly, though,* * *he didn't even tell Sergeant Dickey that he didn't do it. Here he is, it's his only opportunity. It's the only documentation we have of him talking to an East Palestine police officer besides Pillsbury * * * and he didn't even tell Sergeant Dickey that he didn't do it when he had the clear opportunity." (Tr. Vol. II, pp. 371-372.) Statements made in opening and in closing are not substantive evidence, and as such are outside the explicit rule articulated by the Ohio Supreme Court in *Leach*. However, the use of such statements implicates the exact dilemma the Supreme Court designed the *Leach* decision to avoid: "use of pre-arrest silence * * * would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." Id. at ¶31. Comment on pre-arrest silence in closing creates the same issue; either a defendant must forego his right to be (and to remain) silent, or he faces comment on that silence. At oral argument the state vehemently defended statements made in closing as fair comment on testimony. The state is incorrect in this argument. The prosecutor's comments were an expansion on the "course of investigation" testimony offered by Sergeant Dickey and was clearly intended as an inference of guilt. No inference may be drawn from a defendant's decision to remain silent, pre- or post-arrest. This comment amounts to misconduct and, hence, constitutes error.

**{37}** Statements made in closing concerning a defendant's Fifth Amendment protected pre-arrest silence are most analogous to statements made in closing concerning a Fifth Amendment protected decision not to take the stand. Comments made by the state in closing on the decision not to take the stand are unanimously recognized as improper. Nevertheless, due to the wide latitude allowed parties in summation, although comment on a defendant's decision not to take the stand constitutes erroneous misconduct, such comments are not always found to be reversible error. *State v. Thompson* (1987), 33 Ohio St.3d 1, 4-5, 514 N.E.2d 407 (finding that, although the prosecutor in question may be liable for sanction, even complete sanction, that in the face of overwhelming physical evidence defendant could not prove prejudice); see also *State v. Webb* (1994), 70 Ohio St.3d 325, 328, 638 N.E.2d 1023.

**{38}** Once again, when the prosecutor commented in closing on Sergeant Dickey's testimony, no objection was raised before the trial court, waiving all but a plain error review of each statement. Crim.R. 52(B). A finding of plain error cannot be made unless the outcome clearly would have been different if not for the error. *Waddell*, supra at 166. Statements must be considered both in the context of the entire closing and, if found to be error, in the context of the entire trial to determine whether the error necessitates reversal. The remarks identified by Appellant do not rise to that level. While these improper comments appear to be both irresponsible and overreaching, the record contains evidence, if believed, that would convict Appellant. Although the prosecution's assertion concerning Appellant's failure to use

his "chance" to set the record straight was improper, the jury also had before it testimony concerning Appellant's admission to his friend Mr. Lalley; his departure from the state; his lies about his identity; the various versions of the night's events and his statements to Ms. Soles; and M.S.'s consistent description of her experience. It is impossible to conclude that but for the prosecutor's statement Appellant would have been acquitted. The prosecutor's comment was a single instance of an improper comment on protected silence that was an expansion on otherwise appropriate testimony and facts in evidence. *In re J.R.*, 9th Dist. No. 04CA0066-M, 2005-Ohio-4090. The prosecutor's comments do not rise to the level of plain error. Neither the material in the record nor the arguments offered by Appellant demonstrate that the prosecutor's error was the dispositive element tainting the jury's decision. Appellant's fifth assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

{39} "THE TRIAL COURT ABUSED ITS DISCRETION IN DECLARING M.S. COMPETENT TO TESTIFY AT AGE 4½ REGARDING EVENTS THAT WERE ALLEGED TO HAVE OCCURRED WHEN M.S. LESS [SIC] THAN 3 YEARS OLD."

{40} Appellant's second assignment of error challenges the trial court judge's conclusion that M.S. was competent to testify. Competence is defined by statute and the evaluation of competence is conducted by the judge. Decisions regarding competence are discretionary and may be reversed only where there is an abuse of discretion.

**{41}** Ohio Revised Code Section 2317.01, captioned "Competent witnesses," provides that "[a]ll persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly * * * any examination made by the court to determine whether a child is a competent witness shall be conducted by the court in an office or room other than a courtroom or hearing room, shall be conducted in the presence of only those individuals considered necessary by the court for the conduct of the examination or the well-being of the child, and shall be conducted with a court reporter present. The court may allow the prosecutor, guardian ad litem, or attorney for any party to submit questions for use by the court in determining whether the child is a competent witness."

**{42}** Competence of a juvenile witness is evaluated using the factors specified by the Ohio Supreme Court in *State v. Frazier* (1991), 61 Ohio St.3d 247:

**{43}** "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful."

**{44}** Although the trial court must consider all the *Frazier* factors when determining competence, it is not required to make specific findings on each factor when ruling on competence. *Schulte v. Schulte* (1994), 71 Ohio St.3d 41, 43, 715

N.E.2d 719. "The *Frazier* factors play a slightly different role in the hands of a court reviewing a competency determination. As we noted in *Frazier*, the determination of competency is within the sound discretion of the trial judge. The *Frazier* factors form the backdrop against which a reviewing court evaluates whether the trial judge's determination was an abuse of discretion." (Internal citations omitted.) Id. at syllabus.

**{45}** There are no magic words that qualify or disqualify a child witness. The trial court makes a holistic assessment, applying the factors identified by the Supreme Court. Absent a manifestly arbitrary or capricious decision, an assessment of the witness's competence is within the trial court's discretion as the court is in the best position to evaluate a witness it has directly examined. The trial court conducted a competency hearing and spent time questioning M.S. in a manner designed to address each of the *Frazier* factors. The fact that M.S. did not answer all of the questions "correctly," according to Appellant, does not disqualify her. *State v. Anderson*, 154 Ohio App.3d 789, 2003-Ohio-5439. The trial court tested her ability to recollect and describe events, names, and people. The trial court discussed with her the difference between the truth and a lie and addressed whether or not it was important to tell the truth. The prosecutor and defense counsel both had the opportunity to ask additional questions. The court's decision to find M.S. competent was made within the *Frazier* parameters. Nothing in the record supports a conclusion that the decision was unreasonable or arbitrary. Accordingly, we give the

trial court's assessment of the witness's competence due deference and based on this record, it is affirmed.

**{46}** Appellant's second assignment of error is without merit, and is overruled.

<u>ASSIGNMENT OF ERROR NO. 3</u>

**{47}** "THE TRIAL COURT ERRED IN PERMITTING THE DEPOSITION OF THE CHILD WITNESS AND IN PERMITTING THE SAME TO BE CONDUCTED WITHOUT THE DEFENDANT/APPELLANT PRESENT."

**{48}** Appellant's third assignment of error suggests that the trial court violated his Sixth Amendment rights by allowing M.S. to be deposed, and deposed in a separate room. The deposition of a child victim and the use of such a deposition as testimony are controlled by statute. The same code section, R.C. 2945.481, establishes the procedures and requirements for the deposition of a child victim of specific crimes as well as special arrangements for the testimony of a child victim who is less than 13 in specific crimes, including R.C. 2907.02. M.S. was four years old in December, 2009. It is apparent, however, that Appellant's third assignment of error relies upon a misreading of the statute.

**{49}** The relevant portions of the statute reads:

**{50}** **"2945.481 Testimony of child victim**.

**{51}** "* * *

**{52}** "[(A)](2) In any proceeding in the prosecution of a charge of a violation of * * * 2907.02 * * * in which an alleged victim of the violation or offense was a child

who was less than thirteen years of age when the complaint, indictment, or information was filed * * * the judge of the court in which the prosecution is being conducted, upon motion of an attorney for the prosecution, shall order that the testimony of the child victim be taken by deposition. The prosecution may also request that the deposition be videotaped in accordance with division (A)(3) of this section. * * * The defendant shall have the right to attend the deposition and the right to be represented by counsel. Depositions shall be taken in the manner provided in civil cases, except that the judge shall preside at the taking of the deposition and shall rule at that time on any objections of the prosecution or the attorney for the defense. The prosecution and the attorney for the defense shall have the right, as at trial, to full examination and cross-examination of the child victim whose deposition is to be taken.* * * If a deposition of a child victim taken under this division is admitted as evidence at the proceeding under division (B) of this section, the child victim shall not be required to testify in person at the proceeding. * * *

{53} "(3) If the prosecution requests that a deposition to be taken under division (A)(2) of this section be videotaped, the judge shall order that the deposition be videotaped in accordance with this division * * * the judge shall exclude from the room in which the deposition is to be taken every person except the child victim giving the * * * deposition, and any person whose presence the judge determines would contribute to the welfare and well-being of the child victim giving the deposition. The person chosen by the child victim shall not be a witness in the proceeding and, both before and during the deposition, shall not discuss the

testimony of the child victim with any other witness in the proceeding. To the extent feasible, any person operating the recording equipment shall be restricted to a room adjacent to the room in which the deposition is being taken, or to a location in the room in which the deposition is being taken  * * * so that the person operating the recording equipment can see and hear, but cannot be seen or heard by, the child victim giving the deposition during the deposition. *The defendant shall be permitted to observe and hear the testimony * * * and shall be restricted to a location from which the defendant cannot be seen or heard by the child victim giving the deposition, except on a monitor provided for that purpose. * * ** A deposition that is videotaped under this division shall be taken and filed in the manner described in division (A)(2) of this section * * * and, *if a deposition that is videotaped under this division is admitted as evidence at the proceeding, the child victim shall not be required to testify in person at the proceeding* * * *

**{54}**   "* * *

**{55}**   "(B)(1) At any proceeding in a prosecution in relation to which a deposition was taken under division (A) of this section, the deposition or a part of it is admissible in evidence upon motion of the prosecution if the testimony in the deposition or the part to be admitted is not excluded by the hearsay rule and if the deposition or the part to be admitted otherwise is admissible under the Rules of Evidence. For purposes of this division, testimony is not excluded by the hearsay rule * * * if both of the following apply:

**{56}** "(a) The defendant had an opportunity and similar motive at the time of the taking of the deposition to develop the testimony by direct, cross, or redirect examination.

**{57}** "(b) the judge determines that there is reasonable cause to believe that, if the child victim who gave the testimony in the deposition were to testify in person at the proceeding, the child victim would experience serious emotional trauma as a result of the child victim's participation at the proceeding.

**{58}** "(2) Objections to receiving in evidence a deposition or a part of it under division (B) of this section shall be made as provided in civil actions.

**{59}** "* * *

**{60}** "(C) * * * testimony of the child victim to be taken in a room other than the room in which the proceeding is being conducted and be televised, by closed circuit equipment, into the room in which the proceeding is being conducted to be viewed by the jury, if applicable, the defendant, and any other persons who are not permitted in the room in which the testimony is to be taken but who would have been present during the testimony of the child victim had it been given in the room in which the proceeding is being conducted. * * *

**{61}** "(D) * * * testimony of the child victim to be taken outside of the room in which the proceeding is being conducted and be recorded for showing in the room in which the proceeding is being conducted before the judge, the jury, if applicable, the defendant, and any other persons who would have been present during the

testimony of the child victim had it been given in the room in which the proceeding is being conducted. * * *

**{62}** "(E) For purposes of divisions (C) and (D) of this section, a judge may order the testimony of a child victim to be taken outside the room in which the proceeding is being conducted if the judge determines that the child victim is unavailable to testify in the room in the physical presence of the defendant due to one or more of the following:

**{63}** "(1) The persistent refusal of the child victim to testify despite judicial requests to do so;

**{64}** "(2) The inability of the child victim to communicate about the alleged violation or offense because of extreme fear, failure of memory, or another similar reason;

**{65}** "(3) The substantial likelihood that the child victim will suffer serious emotional trauma from so testifying.

**{66}** "* * *

**{67}** "(F)(2) A judge who makes any determination regarding the admissibility of a deposition under divisions (A) and (B) of this section, the videotaping of a deposition under division (A)(3) of this section, of the taking of testimony outside of the room in which a proceeding is being conducted under division (C) or (D) of this section, shall enter the determination and findings on the record in the proceedings." (Emphasis added.)

{68} On December 2, 2009 the prosecution moved for a deposition to be conducted pursuant to R.C. 2945.481, indicating that Appellant was charged with a violation of R.C. 2907.02, that the child victim in question was less than thirteen (13), and that the state intended to offer this testimony as evidence in lieu of live testimony. The state's motion clearly provides for compliance with the statutory procedure: "[t]he State further agrees to make all necessary 'technical' arrangements for the videotaping of the child's deposition, including the required monitors for both the child victim and Defendant pursuant to R.C. 2945.481(A)(3)." (12/2/09 Motion to Take Videotaped Depo.) The trial court set the motion for a hearing on December 7, 2009. The hearing was conducted on the record. Defense counsel objected to the taking of the deposition, arguing that Appellant must be present unless the court makes a finding that the defendant's presence at the deposition would harm the child prior to the deposition. The state agreed that such a finding is necessary to admit the deposition at trial, but stated that the deposition itself could go forward as provided under the rule, without this finding. The court specifically agreed with the prosecutor that the deposition could proceed pursuant to rule without a finding of harm, and found that the factors alluded to by defense counsel went to admissibility, not the conduct of the deposition itself. The court granted the motion for video deposition on the record and ordered the state "to make all necessary arrangements" for the deposition. (12/8/09 J.E.)

{69} In Appellant's third assignment of error he confuses the statutory requirements for a deposition to be taken pursuant to R.C. 2945.481(A)(2) and the

requirements for a child victim to be allowed to testify outside of the courtroom pursuant to R.C. 2945.481(C) or (D). Under the plain language of the statue, the prosecution may move for a deposition, and may request that the deposition be videotaped as described, and the court "shall" grant those motions and make arrangements for the deposition to be conducted as described in the statute. R.C. 2945.481(A)(2) and (3). A motion for deposition and "request" that the deposition to be videotaped, pursuant to R.C. 2945.481(A)(3), does not trigger the requirements of R.C. 2945.481(E) identified by Appellant. Motions for deposition may be granted without any inquiry into the mental state of the child, refusal of the child to speak, or inability of the child to communicate in the presence of defendant. If, however, the prosecution seeks to enter the deposition into evidence or offer the deposition in lieu of testimony, additional findings must be made. R.C. 2945.481(A)(2), (A)(3), (B).

**{70}** Appellant's third assignment of error challenges only the decision to allow the video deposition pursuant to R.C. 2945.481(A)(3), arguing that the deposition may only be conducted outside the presence of the defendant if the requirements of R.C. 2945.481(E) have been met. This is simply not the case. The requirements of R.C. 2945.481(E) explicitly apply only to sections (C) and (D) which qualify testimony given outside the courtroom. When a deposition is offered in evidence it must then satisfy part (B), which requires that the deposition have been conducted in a manner that fully allowed defendant, with similar motive and opportunity, to develop testimony as at trial. The requirements of (B)(1)(a) and (b) are similar, but not identical to the requirements of (E).

**{71}** The state moved for deposition in accordance with the law, the court held a hearing on the motion, heard objections, determined the applicability of the statute and ruled on the record allowing the deposition. During the deposition Appellant's counsel was present in the room with M.S., and Appellant appeared from the county jail using the court's video arraignment equipment. (12/7/09 Status Conf. Tr., p. 6; 12/15/09 Comp. Hrg. Tr., pp 11-12; M.S. Depo., p. 2.) This is specifically allowed pursuant to the statue that allows for deposition. At trial, prior to permitting the state to play the deposition in lieu of testimony, the court found the conditions specified in R.C. 2945.481 had been met. (Tr., Vol. I, p. 132.) Appellant does not complain that the deposition was improperly admitted; rather, that it was improperly allowed to be taken in the first place. Appellant bears the burden to affirmatively show error by reference to the record. There is nothing in the record that demonstrates any irregularity in the deposition. Absent an affirmative showing and in light of the state's explicit acknowledgment of the audio/visual requirements of R.C. 2945.481(A)(3) this Court "has no choice but to presume the validity of the lower court's proceedings." *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199, 400 N.E.2d 384. Appellant's third assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 4</u>

**{72}** "THE TRIAL COURT ERRED IN PERMITTING INADMISSIBLE HEARSAY TESTIMONY WHICH THE JURY RELIED UPON TO REACH ITS

GUILTY VERDICT IN CONTRAVENTION OF THE DEFENDANT/APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT HIS ACCUSERS."

**{73}** Appellant's fourth assignment of error challenges the trial court's decision to allow testimony by Lisa Soles and Dr. Paul McPherson of statements made by M.S. No hearsay objection was made at trial to the testimony of Ms. Soles identified by Appellant. Appellant has waived all but plain error with regard to Ms. Soles' statements. The state argues that the child's statements, as described by Ms. Soles, are excited utterances and admissible under that exception to the hearsay rule. Objections to the testimony of Dr. McPherson were made, and overruled during his video deposition. Questions of admissibility are subject to the discretion of the trial court, absent an abuse of discretion, an appellate court will not disturb the ruling by a trial court as to the admissibility of evidence. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 483 N.E.2d 1157. An abuse of discretion connotes more than an error of judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

**{74}** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Evidence Rule 802 contains the general prohibition against the admission of hearsay. It provides: "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule

of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Exceptions to this general prohibition are enumerated in Evid.R. 803. Pertinent to this appeal is Evid.R. 803(2), which permits the admission of the following: "**Excited utterance**. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Although the statements identified by Appellant are hearsay, they are admissible under exceptions to the hearsay rule.

{75} The admission of excited statements is based on a premise of reliability. "'This exception derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated.'" Staff Note to Evid.R. 803(2) citing McCormick on Evidence, § 297 (2d ed. 1972). In essence, "excited utterance must be the product of reactive rather than reflective thinking: 'Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense. Accordingly, Rule 803(2) assumes that excited utterances are not flawed by lapses of memory or risks of insincerity.'" (Emphasis in original.) *State v. Taylor* (1993), 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (citing Weissenberger's Ohio Evidence (1992), Section 803.16. See, also, 4 Louisell & Mueller, Federal Evidence (1980) 491-492, Section 439).

**{76}** In *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, the Ohio Supreme Court established a four-part test to determine the admissibility of a "spontaneous exclamation":

**{77}** "Such testimony as to a statement or declaration *may be* admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." (Emphasis sic.) Id. at paragraph two of the syllabus.

**{78}** The fact that a statement is made in response to a question does not preclude it from being considered "excited utterance." *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466. The "admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading,

(2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." Id. at 93.

{79} In *Wallace* the utterance deemed admissible was made by a five-year-old victim of assault fifteen (15) hours after the incident in response to questioning. During the fifteen intervening hours the child victim was unconscious or semi-conscious. The *Wallace* Court held "[a] period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purposes of satisfying the excited-utterance exception to the hearsay rule." Id. at paragraph one of the syllabus. The Court noted that a period of "[c]ontinuing emotional or physical shock" may prolong the effect of sexual assault, "particularly when victims are of tender years." Id. at 90-91, fn 4. See also, *State v. Humphries* (1992), 79 Ohio App.3d 589, 607 N.E.2d 921; *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316; *State v. Smith* (1986), 34 Ohio App.3d 180, 571 N.E.2d 933 (the time element is not the controlling factor in rape cases, the controlling elements are the "circumstances as would reasonably show that [the statement] resulted from impulse rather than reason and reflection." Id. at 190.)

{80} Also relevant to this assignment of error is Evid.R. 803, which provides "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness" section (4) of Evid.R. 803 is titled "**Statements for purposes of medical diagnosis or treatment**." Evidence Rule 803(4) allows "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history,

or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" to be admitted in evidence even though they would otherwise be excluded as hearsay. The Ohio Supreme Court considered the admissibility of statements made by a child victim at length in *State v. Dever* (1992), 64 Ohio St.3d 401, 696 N.E.2d 436, and modifying the earlier rule of *State v. Boston* (1989), 46 Ohio St.3d 108, 115, 545 N.E.2d 1220. The *Dever* Court found "[t]he trial court should consider the circumstances surrounding the making of the hearsay statement. If the trial court finds * * * that the child's statements were inappropriately influenced by another, then those statements would not have been made for the purpose of diagnosis or treatment." Id. at 410. The trial court's inquiry will necessarily depend on the facts of each case. Id. The trial court "may consider whether the child's statement was in response to a suggestive or leading question * * * and any other factor which would affect the reliability of the statements (such as [a] bitter custody battle* * *). If no such factors exist, the evidence should be admitted. The credibility of the statements would then be for the jury to evaluate in its role as factfinder." Id.

(A) Testimony of Ms. Soles.

**{81}** At trial Ms. Soles testified that she woke up on March 28, 2008 and went into the kitchen to prepare breakfast. While she was in the kitchen, she heard her daughter's voice in the next room, speaking to Appellant: "'Earl, you licked my peepee. Earl, you licked my butt.'" When she heard what her daughter said, Ms. Soles came into the living room and asked "'What did you say?' And Earl interjected

and said. 'Oh, she means I wiped her butt.'" (Tr. Vol. I, pp.166-167.)  Ms. Soles said that Appellant claimed the child had had an accident and that he had cleaned her up, but not changed her underwear.  She also said that while Appellant was talking to her, he was also collecting his things and left almost immediately.  (Tr. Vol. I, p. 169.)  Ms. Soles was then asked by the prosecutor whether M.S. spoke with her after Appellant left and whether she had asked her daughter questions or if the child had volunteered information.  Defense counsel objected generally "there's no foundation for this testimony at this time" and was overruled.  (Tr. Vol. I, pp. 169-170.)

{82}   Ms. Soles continued as instructed.  She testified that when Appellant left M.S. came into the kitchen with her.  While in the kitchen Ms. Soles asked: "'M.S., did you poop the bed last night?'" to which the child replied, "'No, Mommy, I didn't poop the bed.'" (Tr. Vol I, p. 169.)  Ms. Soles' testimony continued:

{83}   "* * * 'Well, what happened?'  'Earl got in my bed, Mommy, and under my covers and he tickled me.'  'Okay.'  'Then Aiden woke up, Mommy.'  Aiden was my friend's son.  'And Aiden woke up and he wouldn't go back to sleep and he wouldn't be quiet and Earl told him to be quiet and he didn't.  So Earl took me out of my bed.'  My little girl had a tiny bruise above her eye.  And I said, 'What happened to your eye?'  'When he took me out of bed, he bumped it on the head – the bedpost.'  'What happened?'  'He took me in your room, Mommy.'  I said, "Did you sleep there?'  'No, Mommy.  Earl took my pants off then he took my panties off and then he licked my peepee and he licked my butt."

{84}   "* * *

**{85}** "And then he took her back to her bed." (Tr. Vol I, p. 170.)

**{86}** After the preliminary objection to foundation, no hearsay objection was made by counsel to this testimony concerning M.S.'s statements on the morning of March 28, 2008 and the subsequent behavioral changes Ms. Soles observed. (Tr. Vol. I pp. 169-170, 181.) As such, Appellant has waived all but plain error with regard to the court's decision to allow these statements. In the context of the extended period of excitement experienced by a child and a young child's lack of capacity for "reason and reflection," statements made spontaneously upon waking, mere hours after the conduct described, are well within the court's discretion to allow under Evid.R. 803(2). *State v. Ashcroft* (1998), Butler County App. No. CA 97-11-217; *Wallace, Humphries,* etc. supra. M.S.'s initial statement was unprompted, and her mother's subsequent open ended questioning does not appear to be inappropriately suggestive. *Wallace*, supra. Questions of weight and credibility were for the jury to settle. The trial court's decision to allow the testimony was not an abuse of discretion, nor does it rise to the level of plain error.

(B) Testimony of Dr. McPherson.

**{87}** Appellant identifies several statements reported to have been made by M.S. in response to questioning by Dr. McPherson and a statement reported by Dr. McPherson as having been made by Ms. Soles as part of M.S.'s medical history. No objection was made to the statements during the state's direct questioning of Dr. McPherson. Defense counsel did object to the statement on redirect, and the

objection was overruled. Due to the objection and the difference in declarant the statements must be evaluated under separate rules.

(1)  Statements Made by M.S.

**{88}**  Dr. McPherson's observation of M.S. and discussion of her history with Ms. Soles were for the purpose of diagnosis and designed to elicit relevant information. Dr. McPherson's testimony reveals both consciousness of the need to identify coaching and sensitivity to a child's susceptibility to suggestive questioning. (McPherson Depo., pp. 12-14, 18-21, 28-31.)  Unlike the circumstances in *Boston*, supra, there was no custody battle and no separate motivation to drive a particular diagnosis. Appellant had, until the incident, by all accounts been Ms. Soles's good friend, often present in the home and a frequent babysitter. As described above, statements made for the purpose of medical diagnosis are an exception to the hearsay rule, and "physicians, by virtue of their training and experience, are quite competent to determine whether particular information given to them in the course of a professional evaluation is 'reasonably pertinent to diagnosis or treatment' and are not prone to rely upon inaccurate or false data in making a diagnosis or in prescribing a course of treatment." *King v. People* (Colo.1990), 785 P.2d 596 (as quoted by *State v. Muttart*, 116 Ohio St.3d 5, 13, 2007-Ohio-5267, 875 N.E.2d 944). In *Muttart* the Ohio Supreme Court elaborated:

**{89}**  "We are aware, of course, of the possibility that parents of abused children may give false information to a physician, including denials or deliberate misidentifications, see *United States v. Yazzie* (C.A.9, 1995), 59 F.3d 807, 813, and

that a victim might deny abuse to the physician, particularly when in the company of the abuser. Such falsehoods may be a survival strategy or may reflect a complex psychodynamic or phenomena that untrained persons may not understand fully. Although physicians and psychotherapists are not infallible when diagnosing abuse, we believe that their education, training, experience, and expertise make them at least as well equipped as judges to detect and consider those possibilities." Id. at ¶42.

**{90}** Under the principles in *Muttart* the trial court's decision to admit Dr. McPherson's testimony concerning M.S.'s statements was appropriate. Once admitted, the weight was a question for the jury. The court's decision to allow Dr. McPherson's relevant and probative testimony was not a violation of the confrontation clause of the Sixth Amendment or the Ohio Rules of Evidence. As such, it did not rise to the level of plain error.

(2) Statements Made by Ms. Soles.

**{91}** Appellant points to a single instance of testimony, on page 40 of the deposition, where on redirect the prosecutor asks Dr. McPherson to elaborate as to information he relied on when evaluating M.S. and the section of his report titled "Review of Symptoms." Appellant argues the doctor's response to the question was hearsay within hearsay. (McPherson Depo., p. 40). During the deposition, defense counsel objected that the statement was hearsay within hearsay but the objection was overruled. What Appellant's argument does not discuss are the various points in the prior seventeen pages of the deposition where defense counsel cross-examined

Dr. McPherson on his training, his methodology, and the information he relied on in evaluating M.S.'s condition. Defense counsel specifically elicited both M.S.'s statements and her mother's statements, resulting in the following testimony: "when I spoke with - - during our initial eval - - initial talking with mom, I was informed that the patient told mom, 'Earl, you licked my butt,' while Earl was present. And then Earl responded by saying, "I wiped your butt.'" (McPherson Depo., p. 22.)

{92} With regard to the confrontation clause and the admissibility of otherwise inadmissible hearsay the threshold question is whether the hearsay at issue testimonial or non-testimonial hearsay. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law * * * [w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington* (2004), 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177, 203. "While the Court declined to settle on a single formulation, it noted that, '[w]hatever else the term [testimonial] covers, it applies [ ] to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. These are the modern abuses at which the Confrontation Clause was directed.'" *Horton v. Allen* (C.A.1, 2004), 370 F.3d 75, 84, citing and quoting *Crawford,* supra. The testimony at issue here is the statement of a minor made to her mother and reported to a physician for the purposes of diagnosis. It is nontestimonial in nature and does not raise a Sixth

Amendment issue. The testimony is instead subject to Ohio common law concerning hearsay.

**{93}** Under the common law, where, as here, a party chooses to open the door to otherwise inadmissible testimony, it is within the court's discretion to allow the other party to elicit additional clarifying testimony on the same issue. "'Under the rule of curative admissibility, or the "opening the door" doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.'" *State v. Dunivant*, 5th Dist. No. 2003CA00175, 2005-Ohio-1497, ¶12 (See, also, *United States v. Moody* (C.A.6, 1967), 371 F.2d 688, 693, "'With the door opened this widely in favor of [defendant], we cannot say that the District Judge's rulings in favor of appellee's proffered hearsay on the same subject was an abuse of judicial discretion or constituted reversible error;'" and *State v. Croom* (Jan. 18, 1996), 8th Dist. No. 67135, at *17. "Invited error would preclude a defense counsel who induces hearsay evidence on cross-examination from precluding further hearsay testimony on re-direct examination.")

**{94}** The doctor's statement on re-direct, placed in context of defense counsel's cross-examination, was within the court's discretion to allow as invited error, described above. The fact that the statement was hearsay during redirect could be cured by defense counsel's prior decision to address the issue on cross. The trial court's decision to allow the testimony was not unreasonable, arbitrary, or unconscionable and therefore was not an abuse of discretion.

**{95}** Appellant's fourth assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 6

**{96}** "DEFENDANT/APPELLANT WAS DENIED DUE PROCESS OF LAW SUCH THAT REVERSAL IS REQUIRED BECAUSE THE TRIAL COURT FAILED TO PROPERLY INSTRUCT THE JURY."

**{97}** Appellant's sixth assignment of error rests on a single abbreviated quote plucked from sixteen (16) pages of jury instructions. (Tr. Vol. II, pp. 402-418.) Appellant argues that because the words "beyond a reasonable doubt" do not appear in Appellant's carefully selected quote the trial court failed to properly instruct the jury. On review, "[a] jury instruction must be viewed in the context of the overall charge rather than in isolation." *State v. Lewis* (1993), 67 Ohio St.3d 200, 203, 616 N.E.2d 921, citing *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772. Appellant's argument fails, as within these sixteen pages of jury instructions, recorded by the court and provided to the jury during deliberations, there appears a full page of instruction as to the meaning of reasonable doubt and the role of reasonable doubt in the state's burden of proof. (Tr. Vol. II, pp. 403-404.) The court explained the elements of the crime charged. The court then instructed the jury as to the treatment of evidence and testimony before re-stating the state's burden: "[b]efore you can find the Defendant guilty, you must find beyond a reasonable doubt that [continued to re-list the elements and define terms]." (Tr. Vol. II, pp.409-410.) The trial court concluded with the quote selected by Appellant "[i]f you find that the State has proven all the elements of the charge of rape, including that the victim was

less than thirteen years of age* * *." (Tr. Vol. II, p. 410.) Appellant's argument is wholly without merit. The jury was properly instructed as to the state's burden and the requirement of proof beyond a reasonable doubt. Appellant's sixth assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 7

**{98}** "DEFENDANT/APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

ASSIGNMENT OF ERROR NO. 8

**{99}** "THE STATE OF OHIO FAILED TO PRODUCE SUFFICIENT EVIDENCE AS TO THE COMMISSION OF THE SEX ACT OF CUNNILINGUS."

**{100}** Appellant herein challenges both the sufficiency and the manifest weight of the evidence. To determine whether sufficient evidence exists to support a conviction, the reviewing court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. In determining whether a criminal judgment is against the manifest weight of the evidence, this Court acts as a "thirteenth juror" to determine whether, "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The verdict is not against the weight of the evidence when there is

evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 383 N.E.2d 132.

{101} "A verdict that is supported by sufficient evidence may still be against the manifest weight of the evidence. 'Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."' (Emphasis sic.)" (Internal citations omitted.) *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, supra, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

{102} The state's case is supported by the testimony of thirteen witnesses; the defense called a single witness. Among the state's thirteen witnesses were both of Appellant's employers, who had no relationship with the victim or the victim's mother and no incentive to harm Appellant, whom they both describe as a good worker. The state's most damning piece of evidence is readily identifiable: Appellant's admission via telephone to his friend and sometimes-employer Bob Lalley

that he "did something [he] could go to prison for," he "touched a little girl inappropriately." (Tr. Vol. II, p. 292.) Appellant's admission is compounded by his own behavior: applying for a transfer, accepting the check for expenses, then quitting his regular job without returning the check and leaving the state. None of the errors alleged by Appellant concerning the videotaped deposition, statements made by the prosecutor, or by other witnesses has the same effect.

{103} With regard to the sex act, it is the responsibility of the jury to resolve questions of fact and to determine the credibility and weight of the testimony of the young witness. *DeHass*, supra; *State v. McConnell*, 2nd Dist. No. 19993, 2004-Ohio-4263. M.S.'s statements to Appellant, overheard by her mother, statements made directly to her mother, and statements to Dr. McPherson were admissible as excited utterances and statements made for medical diagnosis. M.S.'s reported statements and her testimony in the deposition are consistent. When asked by the doctor where Appellant licked her, the child placed her hand in her underwear to show him. M.S. was equally able to show where, on anatomically correct drawings, contact occurred. Courts readily accept the fact that young children use a variety of words to describe their genitals. See, e.g. *McConnell*, supra; *In re D.M.*, 158 Ohio App.3d 780, 2004-Ohio-585; *Dever*, supra. The jury was instructed as to the elements of the offense and the findings necessary to a verdict, and the jury was polled at the request of defense counsel. The jury had before it evidence sufficient to support its conclusion that prohibited contact had occurred. The evidence in the record does not support a conclusion that the jury lost its way in believing the state's version of the events at

issue in this case. Accordingly, Appellant's seventh and eighth assignments of error are overruled.

<u>ASSIGNMENT OF ERROR NO. 9</u>

{104} "DEFENDANT/APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS IN THESE PROCEEDINGS."

{105} Appellant contends that each of the errors identified in his preceding assignments are reversible, but that even if they were individually found harmless their cumulative effect deprived him of a fair trial. However, errors do not become prejudicial "by sheer weight of numbers." *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶241. Although cumulative error may "be found when the effect of multiple errors * * * acts to deprive the defendant of his constitutional right to a fair trial * * * an assignment of error that simply intones the phrase 'cumulative error' but offers no analysis or argument constitutes an assignment of error without substance." *State v. Scott*, 7th Dist. No. 07 MA 152, 2009-Ohio-4961, ¶92–93 (citing *State v. Garner* (1995), 74 Ohio St.3d 49, 656 N.E.2d 150 and *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150). Appellant offers no argument or analysis in his brief.

{106} Although some statements made in closing argument concerning Appellant's pre-arrest silence were error, Appellant has failed to show prejudice resulting from the error. Appellant's six other assignments, which frequently misrepresent the record, fail to show error and are equally without merit. Even if

errors could become prejudicial by sheer weight of numbers, such numbers do not exist here. There is nothing in the record to suggest that, but for the fact that the jury was told Appellant failed, pre-arrest, to assert his innocence to the police, the jury would have acquitted him. Absent other error there is no cumulative effect that worked to deprive Appellant of his right to a fair trial.

**{107}** Appellant's ninth assignment of error is without merit and is overruled.

## CONCLUSION

**{108}** Appellant's arguments that his Fifth Amendment, Sixth Amendment, and due process rights were violated are without merit. Similarly, his allegations of prejudicial misconduct, abuse of discretion, evidentiary violations, failure to properly instruct the jury, and cumulative error are equally without merit. Appellant's conviction was based upon sufficient evidence and not against the manifest weight of the evidence. Appellant's nine assignments of error are without merit and overruled. The judgment of the trial court is affirmed.

Donofrio, J., concurs.

DeGenaro, J., concurs.